**MORRISON COHEN LLP**
Y. David Scharf
Christopher Milito (pro hac vice forthcoming)
Collin A. Rose (pro hac vice forthcoming)
909 Third Avenue
New York, New York 10022
212-735-8600

*Attorneys for Defendants Acier Holdings LLC,*
*Knight Construction, LLC, Dov Zabrowsky, Moshe*
*Glatzer and Jacob Glatzer*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CMT DEVELOPERS LLC, and DAVID KRAMER , <br><br> Plaintiffs, <br><br> -against- <br><br> ACIER HOLDINGS, LLC, KNIGHT CONSTRUCTION, LLC, DOV ZABROWSKY, MOSHE GLATZER, and JACOB GLATZER, <br><br> Defendants. | Case No.: 3:21-cv-12517 |

Defendants Acier Holdings, LLC, Knight Construction, LLC, Dov Zabrowsky, Moshe Glatzer, and Jacob Glatzer (collectively, the "Defendants"), by and through their attorneys, Morrison Cohen LLP, as and for their Answer with Counterclaims to the Complaint (the "Complaint") filed by Plaintiffs CMT Developers LLC and David Kramer (collectively, the "Plaintiffs"), allege as follows:

## SUMMARY OF CLAIMS

1. Paragraph 1 of the Complaint states a legal conclusion so no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 1 of the Complaint.

1

## PARTIES

2.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2 of the Complaint.

3.      Defendants admit the allegations of Kramer's residence but deny the balance of the allegations set forth in Paragraph 3 of the Complaint.

4.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Complaint.

5.      Defendants admit the allegations set forth in Paragraph 5 of the Complaint.

6.      Defendants admit the allegations set forth in Paragraph 6 of the Complaint.

7.      Defendants admit the allegations set forth in Paragraph 7 of the Complaint.

8.      Defendants admit the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendants admit the allegations set forth in Paragraph 9 of the Complaint.

10.     Defendants admit the allegations set forth in Paragraph 10 of the Complaint.

11.     Defendants deny the allegations set forth in Paragraph 11 of the Complaint.

## JURISDICTION & VENUE

12.     Paragraph 12 of the Complaint states a legal conclusion so no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 12 of the Complaint.

13.     Paragraph 13 of the Complaint states a legal conclusion so no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 13 of the Complaint.

## BACKGROUND

14.     Defendants deny the allegations set forth in Paragraph 14 of the Complaint except to admit that CMT, as nominee for Acier and Kramer, purchased the Property in or around January 2016.

15.     Defendants admit the allegations set forth in Paragraph 15 of the Complaint.

16.     Defendants deny the allegations set forth in Paragraph 16 of the Complaint.

17.     Defendants deny the allegations set forth in Paragraph 17 of the Complaint.

18.     Defendants deny the allegations set forth in Paragraph 18 of the Complaint.

19.     Defendants deny the allegations set forth in Paragraph 19 of the Complaint.

20.     Defendants deny the allegations set forth in Paragraph 20 of the Complaint.

21.     Defendants deny the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendants deny the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendants deny the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendants deny the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendants deny the allegations set forth in Paragraph 27 of the Complaint.

## AS AND FOR THE FIRST CAUSE OF ACTION
(Declaratory Judgment)

28.     Defendants repeat and reallege each and every response and allegation set forth as if fully set forth herein.

29.     Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendants deny the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendants deny the allegations set forth in Paragraph 31 of the Complaint.

## AS AND FOR THE SECOND CAUSE OF ACTION
(Unjust Enrichment)

32.     Defendants repeat and reallege each and every response and allegation set forth as if fully set forth herein.

33.     Defendants deny the allegations set forth in Paragraph 33 of the Complaint.

34.     Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations set forth in Paragraph 35 of the Complaint.

## AS AND FOR THE THIRD CAUSE OF ACTION
(Conversion)

36.     Defendants repeat and reallege each and every response and allegation set forth as if fully set forth herein.

37.     Defendants deny the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendants deny the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

## AS AND FOR THE THIRD CAUSE OF ACTION
(False Advertising Trademark Infringement and Unfair Competition)

41.     Defendants repeat and reallege each and every response and allegation set forth as if fully set forth herein.

42.     Defendants deny the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendants deny the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendants deny the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendants deny the allegations set forth in Paragraph 46 of the Complaint.

## JURY DEMAND

47.     Paragraph 13 of the Complaint states a legal conclusion so no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 13 of the Complaint.

WHEREFORE, Defendants deny that Plaintiffs are entitled to any of the relief requested in the *ad danum* clause, or to any relief at all.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim against the Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, by documentary evidence.

### THIRD AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, by the parties' explicit and binding agreements that set forth the parties' rights and obligations with respect to each other.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, by the doctrines of unclean hands, waiver, laches, release and/or estoppel.

### FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because Defendants are individuals who did not act in their individual capacity such that they can be personally liable to Plaintiffs.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because certain of Plaintiffs and Defendants were joint venturers with respect to the Development Project.

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, by the applicable statutes of limitations.

## EIGHTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because the Defendants have not made any false representations concerning an ownership interest in CMT or the ownership of the Development Project.

## NINTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because the Defendants have not misappropriated, or otherwise converted, any of the Development Funds.

## TENTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because certain of the Defendants have a possessory interest in the Development Funds.

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because jurisdiction is improper.

## TWELFTH AFFIRMATIVE DEFENSE

The Complaint is barred against the Defendants, in whole or in part, because an award in Plaintiffs favor would unjustly enrich Plaintiffs.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available during pretrial proceedings in this action, and reserve all rights to amend this Answer and all such defenses asserted herein.

## COUNTERCLAIMS

Acier Holdings, LLC, Knight Construction, LLC, Dov Zabrowsky, Moshe Glatzer, and Jacob Glatzer, as and for their Counterclaim against Plaintiffs David Kramer ("Kramer") and CMT Developers LLC ("CMT") (together with Kramer, the "Plaintiffs"), alleges as follows:

## NATURE OF ACTION

1.     This litigation arises out David Kramer's wrongful denial of the joint venture between him and Acier to acquire and develop the properties located at 907-931 East Jersey Street, Elizabeth, New Jersey (the "Property"), the former location of the Elizabeth General Medical Center.  After five years of partnership, phase one of the project is nearly complete and proceeds soon will be realized.  At precisely this time, Kramer has become grotesquely greedy – a caricature of the archetypical avaricious New York real estate developer - seeking to appropriate for himself the entire economic benefit of the joint venture.  This attempted appropriation would ignore the parties' long-standing agreement and cooperation, not to mention the millions of dollars in capital and effort invested by Acier, Knight and their principals.

2.     Well-before Kramer had even heard of the Property, Acier and its principals sourced and purchased the Property through their affiliate CMT.  The joint venture with Kramer arose only after Acier's acquisition of the Property.  It was not until January 2016 that the parties agreed to work together to develop the Property for use in a future residential, retail and parking development.   Acier was an experienced developer/builder, but required the "balance-sheet

7

backing" of a partner with greater assets to secure appropriate construction financing.  Acier discussed the Property and project with Kramer and the two agreed to form a joint venture to develop the Property, using Acier's affiliate CMT Developers LLC as the joint venture's nominee.

3.     Pursuant to the original agreement, Acier was to receive ninety-percent (90%) of the profits and losses of the development, with Kramer receiving the remaining ten-percent (10%). Since the purchase of the Property, the parties have, consistent with their joint venture, worked together to push the planned development forward.

4.     Acier has been a full participant in the Property's development, standing side by side with Kramer.  In fact, Acier has been the development/construction lead, both in its own right and through its subsidiary Knight Construction, LLC ("Knight").  Acier has contributed over $8.8 million to the development in the aggregate, sourced and help close successive rounds of financing for the project, had its principals execute personal guaranties of the debt, and has overseen and managed the development's construction through its affiliate, Knight.

5.     Despite Acier's and Knight's extraordinary efforts to develop the Property (especially by staying close to schedule during the Covid-19 pandemic), Kramer has taken the position that the now-partially constructed development is not a joint venture between him and Acier, but rather is solely owned by himself via CMT.  This eminently wrongful position will deprive Acier and its principals of their significant investment of capital and effort over the past five years.

6.     Kramer's actions have not only harmed the development (e.g. the development's lenders are now confused about the development's ownership), but they are completely contradicted by the parties' agreement and course of conduct.  Despite Acier's recent attempts to reason with Kramer, he continues to maintain that the Property belongs to him and him alone.

7.      In the face of Kramer's complaint (filed while the parties were in the middle of settlement negotiations), Acier has been left no choice but to seek its own relief from this Court. Accordingly, Acier now comes to this Court to request a declaration proclaiming that (i) Acier and Kramer are joint-venturers in the Property, (ii) Acier has a majority ownership interest in the Property, its development and the proceeds flowing therefrom, and (iii) that the parties shall share in the development's profits and losses according to their agreement.

## PARTIES

8.      Defendant Acier Holdings LLC is a New Jersey Limited Liability Company with its principal place of business in New Jersey.

9.      Defendant Knight Construction, LLC is a New Jersey Limited Liability Company with its principal place of business in New Jersey.

10.     Plaintiff David Kramer is an individual residing in Brooklyn, New York.

11.     Plaintiff CMT Developers LLC is a New Jersey Limited Liability Company with its principal place of business at 1950 Rutgers University Blvd, Suite 102, Lakewood, NJ 08701.

## FACTS COMMON TO ALL ALLEGATIONS

### A.   ACIER, KRAMER, AND CMT FORM A JOINT VENTURE TO DEVELOP JERSEY WALK

12.     The joint venture between Acier and the Plaintiffs dates back to 2016, *after* the Property was purchased by Acier's affiliate CMT on January 12, 2016, for $7,000,000, from H Elizabeth Realty, LLC.

13.     Prior to and at the time of the purchase of the Property, Kramer was a complete stranger to the Property.  Martin Zelcer had formed and was the managing member of CMT and signed many of the relevant documents to the purchase the Property, including the Affidavit of Title and the Mortgage Note.  At the time, Zelcer also was a member of Acier, evidencing the link

between the two entities.  In fact, CMT had been named as such by Moshe Glatzer and Jake Glatzer, two other owners of Acier.  To this day, CMT's addresses is the same as Acier's in New Jersey.

14.     A partner of Acier, Jacob Glatzer, had sourced the Property opportunity for Acier's benefit and Acier determined to purchase the Property through CMT.  Kramer had no involvement with the Property's acquisition and contributed no funds towards it.

15.     The Property would require significant additional funds to construct.  Although Acier and its principals were experienced developers, they understood that it would be easier to obtain construction financing if a balance sheet partner were procured.  David Kramer fit the bill – his balance sheet was significant enough to satisfy most lenders.  Accordingly, Acier determined that it would make sense to partner with Kramer with respect to the Property.

16.     The Property was purchased by CMT to develop into an apartment complex known as Jersey Walk.  This planned development is to contain over four hundred apartment units, thirty thousand (30,000) square feet of retail space, and a parking garage (the "Jersey Walk Development").  Following CMT's purchase of the Property (when it was managed by Zelcer), Acier and Kramer agreed that the Property would be subject to a joint venture between  Acier and Kramer and that both parties would contribute their expertise in developing the Property into the Jersey Walk Development.  It was understood at the outset that Kramer would not contribute any funds, but instead would only assist in obtaining financing.

17.     In recognition of the joint venture, on January 29, 2016, CMT's managing member, Zelcer (a member of Acier), sold CMT to Kramer for $11 million to bring him into the joint venture.  In consummating this transaction, Acier was "supposed" to receive $4 million of the $11 million purchase price.  But the entire purchase price was a paper transaction: Kramer did not

actually pay any money to acquire CMT and neither Acier nor CMT's owners received any money from him.   Pursuant to this original joint venture agreement, Acier was to receive ninety-percent (90%) of the profits and losses of the development, with Kramer receiving the remaining ten-percent (10%).

18.     As part of their joint venture, the parties also formed several limited liability companies in 2017 to further the Jersey Walk Development. These companies included Jersey Walk E. Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, and Jersey Walk Garage Urban Renewal LLC.  The membership of these companies was made up of Kramer and several of the principals of Acier, namely Dov Zabrowsky, Martin Zelcer, Moshe Glatzer, and Yaakov Glatzer (the "Acier Principals").  Kramer had a twenty-five percent (25%) stake in each limited liability company, with the Acier Principals splitting amongst themselves the remaining seventy-five percent (75%).

**B.     ACIER CONTRIBUTES MONEY TO THE JOINT VENTURE AND OVERSEES THE FINANCES AND CONSTRUCTION OF THE JERSEY WALK DEVELOPMENT**

19.     Following this transaction, and in reliance in their joint venture interest in the Property, Acier continued its lead role in the development and construction of the Property and the Jersey Walk Development.

20.     First and foremost, Acier participated in the Jersey Walk Development by managing its construction through its affiliate, Knight.  In fact, on August 1, 2017, Knight signed construction management agreements with Jersey Walk E. Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, Jersey Walk Garage Urban Renewal LLC— again, all limited liability companies formed by the Acier Principals and Kramer to further the Jersey Walk Development—to serve as the general contractor at the Jersey Walk Development.  Moshe Glatzer, a principal of Acier, signed the construction management agreements on behalf of Jersey Walk E.

11

Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, and Jersey Walk Garage Urban Renewal LLC.

21.     Knight is responsible for the project's construction and has, at all times, been monitored and overseen by Acier.

22.     In addition, Acier participated as an equal in the management and overseeing the financial support for the Jersey Walk Development.  In this capacity, Acier has been responsible for finding and closing a number of financing opportunities to support the Jersey Walk Development's continued construction.

23.     Acier has assisted in finding and closing upon loans for the Jersey Walk Development for many years.  For example, on March 17, 2016, Acier closed upon a loan from ACRES Capital in the amount of $18,480,000.00 to, among other things, satisfy the seller-financed loan that had been taken out from the Property's seller, H Elizabeth Realty, LLC.

24.     Thereafter, on June 13, 2017, Acier found and closed upon a mezzanine loan from Jersey Walk Mezzanine Lender LLC in the amount of $2 million.  Pursuant to the mezzanine loan documents, the loan was made to Jersey Walk Mezz LLC, a New Jersey limited liability company. In support of this mezzanine loan, Kramer and several of Acier's principals (Dov Zabrowsky, Martin Zelcer, Moshe Glatzerm, and Yaakov Glatzer) signed a personal guaranty in the full amount of the mezzanine loan for the benefit of the lender, Jersey Walk Mezzanine Lender LLC.

25.     Acier arranged for this mezzanine loan because the money was necessary to replenish the joint venture's interest reserve for its loan from ACRES Capital and to cover other associated fees with the Jersey Development Project.

26.     In or around December 2017, Acier and Kramer also collaborated on taking a $2 million loan from Premium Assets LLC for the benefit of the Jersey Walk Development.  This

loan was taken out in the names of Kramer and Yaakov Glatzer (a principal of Acier), and it required, *inter alia*, Yaakov Glatzer to pledge his interests in various Acier affiliates, Jake Properties LLC and AG Properties LLC, to take out the loan.  This money was utilized to further the Jersey Walk Development.

27.     On January 11, 2018, Acier's principals and Kramer had a meeting at Kramer's religious and spiritual advisor's house in Monsey, New York.  During these discussions, Kramer requested that the parties alter their joint venture arrangement, as Kramer had later actually invested funds into the Jersey Walk Development (as opposed to his original cashless "contribution").  Accordingly, the parties agreed that Kramer would have an interest in sixty percent (60%) of the Jersey Walk Development going forward, and a fifty percent (50%) interest in any future units at the Jersey Walk Development that would be necessary for the project to be approved and receive certain governmental subsidies.

28.     Following this altered agreement, Acier continued to lead the Jersey Walk Development's management and financial operations.  For example, on March 28, 2018, Acier sourced and helped close a $15,500,000.00 loan to CMT from TBG Development, a real estate developer in New Jersey.  These funds were vital to the project and helped pay off the loan from ACRES Capital.  To assist in closing the loan from TBG Development, both Acier and Kramer signed a personal guaranty for the benefit of TBG Development on March 28, 2018, as co-guarantors.

29.     To assist in getting construction off the ground at the Jersey Walk Development, CMT took out a construction loan from Jersey Walk Phase 1, LLC, on September 26, 2018, in the amount of $74,496,002.00.  This loan was spear-headed by Kramer for the benefit of the Jersey Walk Development joint venture.  However, prior to closing, Acier raised concerns to Kramer

about whether the loan would actually ever be able to fund the Jersey Walk Development construction project.

30.     Despite Acier's concerns about the Jersey Walk Phase 1 construction loan, Acier and its principals took steps to ensure that it could benefit the Jersey Walk Development.  For example, the promissory note reflecting the loan, dated September 26, 2018, was not only signed by Kramer as managing member of CMT, but was also signed by Dov Zabrowsky, Martin Zelcer, Yaakov Glatzer, and Moshe Glatzer, all whom are principals of Acier and were listed as "Partners" of CMT on the Promissory Note.  Similarly, the mortgage taken out to secure this construction loan from Jersey Walk Phase 1, LLC, also dated September 26, 2018, was signed by Kramer, Zabrowsky, Zelcer, Yaakov Glatzer (Jake Glatzer), and Moshe Glatzer.  On the mortgage, Zabrowsky, Zelcer[1] and the Glatzers were listed as members of CMT.

31.     Unfortunately, consistent with Acier's originally-stated concerns, the Jersey Walk Phase 1 construction loan never funded due to problems with the lender.  As a result, Acier had to find and source a separate construction loan to benefit the Jersey Walk Development.

32.     On January 17, 2020, Acier sourced and closed a $56,000,000 construction loan to CMT from Parkview Financial REIT, L.P. ("Parkview Financial").  These funds were crucial to support Phase I of the Jersey Walk Development's construction, which was to include two, six-story buildings that would house over 274 of the planned apartments and the planned retail space. The Jersey Walk Development received over $30 million in draws from Parkview Financial.

33.     In addition to helping the Jersey Walk Development procure sufficient financing and overseeing its construction, Acier has also assisted the development in attempting to procure certain long term tax exemptions through New Jersey's PILOT Program, which allows

---

[1]     Zelcer is no longer affiliated with Acier, having been bought out by his fellow members.

municipalities to grant developers exemptions from traditional property taxes for a set period of time to encourage them to make improvements to property, or to locate a project in a distressed or "blighted" area.

34.     In connection with this program, Acier coordinated applications to the City of Elizabeth, New Jersey in 2017 to seek tax exemptions for Jersey Walk E Jersey Urban Renewal, LLC, Jersey Walk Lafayette Urban Renewal, LLC, and Jersey Walk Garage Urban Renewal, LLC. As discussed above, all three of these entities were created to further the Jersey Walk Development by the Acier Principals and Kramer.

35.     In fact, Kramer did not sign the tax exemption applications; they were signed by a member of Acier. As a result of Acier's efforts, all three of the Jersey Walk Urban Renewal companies were able to secure tax exemptions from property taxes for the Jersey Walk Development as a whole.  Needless to say, these tax exemptions created tremendous value for the Jersey Walk Development joint venture.

36.     To date, in excess of $85 million has been sourced into Jersey Walk Development, between loans on behalf of the project, money provided by Kramer, and money provided by Acier (in the form of direct payments, private debt and a loan to the project).

37.     Out of these funds, Acier has directly contributed in excess $8.84 million to the Jersey Walk Development in aggregate, while Kramer has directly contributed approximately $6.72 million in aggregate.  These capital contributions reflect that, even after the parties' meeting in January 2018, Acier has continued to take on an outsized role with respect to the parties' respective financial support of the Jersey Walk Development joint venture.

38.     Acier has also contributed in non-monetary fashion. In fact, Acier was responsible for redesigning the buildings of the Jersey Walk Development so that the buildings could yield the

same amount of residential units in the same footprint of the old design, but with an additional savings of over $20 million in costs.

39.     Moreover, as discussed above, Acier's outsized contributions have continued even as its affiliate, Knight, continues to oversee and manage the construction of the Jersey Walk Development as its general contractor.  To date, over $34 million has been expended by Knight in construction costs, all made in support of trying to complete the Jersey Walk Development.

## C.     KRAMER ATTEMPTS TO CUT ACIER OUT OF JERSEY WALK DEVELOPMENT

40.     Despite Acier's obvious and ongoing contributions to the Jersey Walk Development joint venture, Kramer has recently claimed that the Jersey Walk Development is not a joint venture, but rather solely owned by Kramer (by way of CMT).

41.     Beginning in or around April 2021, Kramer has stated to potential lenders and others that Acier is not a partner in the Jersey Walk Development, but rather that Acier has solely been serving as the developer of the project.  Of course, Acier has not received any development fee for its efforts as a developer because it was conducting business as a partner in the project.

42.     Kramer's representations to lenders has undercut and threatened Acier's own efforts to secure additional financing for the Jersey Walk Development as a joint venture partner. In this sense, Kramer's representations have harmed the Jersey Walk Development joint venture itself.

43.     As part of Kramer's ongoing efforts, when it came time in April 2021 to resubmit the Jersey Walk Development's PILOT applications (in light of changes to construction), Kramer attempted to have all the relevant documents submitted in (solely) his name.  This was a transparent effort to seize the project for himself.

44.     Moreover, on or around June 1, 2021, Kramer contacted the lender, Parkview Financial, and requested that (1) it no longer disburse its loan proceeds into an account controlled by Acier and Knight, and (2) it disburse the loan proceeds into a substitute account controlled by Kramer.  This was a significant departure, as the funds previously always had been disbursed directly to the Acier account, in recognition of its ownership interest in the project.

45.     In doing so, Kramer attempted to unilaterally take control of the loan proceeds that were going directly to the construction costs of the Jersey Walk Development. This diversion of monies threatens the Jersey Walk Development's construction and its financing, as Acier not only oversees the construction of the Jersey Walk Development, but also ensures that all subcontractors and related-expenses are paid on time.  By diverting these monies, Kramer has threatened the progress of the construction of the Jersey Walk Development.

46.     When Acier discovered Kramer's actions and discussed them with Parkview Financial, Parkview Financial noted that Kramer's actions to change the account had "raised red flags."

47.     Accordingly, Kramer's actions, in addition to threatening the construction of the Jersey Walk Development, have also attracted negative attention from lenders and may impact future financing efforts.

48.     Despite Kramer's demonstrated bad faith, Acier has remained a committed joint venturer acting in good faith.  For example, when Kramer improperly seized sole control of a recent refinancing effort, Acier continued to supply the necessary documentation and information to pursue that effort for the Project, *even though* Acier knew (and communicated to Kramer) that there were alternative lenders that would be better for the Project than the one selected unilaterally by Kramer.

49.     Upon information and belief, Kramer used this information and documentation provided by Acier to close a loan with Madison Realty Capital for over $50 million to take out the Parkview Financial loan.  Despite Acier's requests, Kramer has not made available to Acier the closing documents for this loan, though Acier is aware that over $1.4 million has been drawn from this loan to date.

**D.    KRAMER'S ACTIONS DO NOT VITIATE THE JOINT VENTURE AGREEMENT BETWEEN THE PARTIES**

50.     Considering his actions, Kramer is seemingly attempting to undo his joint venture partnership with Acier and instead make it appear as if the Jersey Walk Development is solely owned by him to the exclusion of Acier.

51.     This, however, is contrary to both the parties' binding agreement and years-long course of conduct, both of which establish that Acier is a joint venture partner with Kramer in CMT, the venture's nominee with respect to the Jersey Walk Development.

52.     Not only have Kramer and Acier reached multiple agreements with respect to the division of profits and losses in connection with the Jersey Walk Development, but the parties have worked together for years towards the mutual goal of financing and completing the construction of the Jersey Walk Development. Indeed, Kramer and Acier have all contributed money, efforts, and expertise to furthering the joint venture project, although on balance Acier's contributions in all areas surpass those of Kramer.

53.     Thus, Kramer has no basis to claim (1) that the Jersey Walk Development is solely owned by himself, and/or (2) that Acier is solely the developer of the Jersey Walk Development.

54.     In fact, if Acier was the general contract of the Jersey Walk Development as Kramer has claimed, Acier and Kramer's financial relationship with respect to the Jersey Walk

Development would have been substantially different.   Were Acier merely the project's third-party developer, Acier would have taken the following actions:

- Acier would have charged CMT a management fee / developer fee for its efforts to develop the Property;

- Acier's affiliate Knight would have submitted numerous change orders, totaling over $9 million, reflecting necessary changes in the construction plan;

- Acier's affiliate Knight would have charged for the rising cost of construction materials, particularly as the cost of many construction materials have risen over 300% over the prior year; and

- Acier's affiliate Knight, serving as the actual general contractor, would have demanded a substantially increased construction budget. Acier, in recognition of their partnership in the Jersey Walk  Development, agreed for Knight to work on a budget with much less overhead than the industry standard.

55.    Moreover, if Acier were only the developer of the Jersey Walk Development, as opposed to a joint venture partner, the Acier Principals never would have taken on personal liability (in the form of personal guaranties) to secure financing for the project.

56.    Altogether, given Acier's explicit agreement with Kramer to form a joint venture to pursue the Jersey Walk Development, as well as Acier's contributions to the joint venture—including (i) acquiring the Property and contributing it to the joint venture; (ii) investing capital and signing debt guaranties; (iii) overseeing its construction (at a steep discount) through its affiliate Knight, and (iv) pursuing and procuring tax exemptions for the project—there can be little doubt that Acier and Kramer are in fact joint venture partners and therefore shall share in the profits and losses of the Jersey Walk Development.

## FIRST COUNT
### (Declaratory Judgment)

57.     Defendants repeat and reallege every paragraph set forth above as if fully set forth herein.

58.     At the very beginning of the Jersey Walk Development project, Acier and Kramer have agreed that the Jersey Walk Development was to be a joint venture between the parties.

59.     Over time, the parties have amended their joint venture agreement to update the sshare of the profits and losses that they were respectively entitled to as part of the joint venture. For example, the parties originally agreed that the joint venture between the parties would result in Acier receiving ninety-percent (90%) of the profits (or losses) of the Jersey Walk Development (with Kramer receiving the remaining ten-percent (10%)).  However, on January 11, 2018, in light of Kramer's request for a larger role in the venture, the parties modified their agreement such that they would equally split the profits and losses of the Jersey Walk Development between Acier and Kramer.

60.     In reliance on this agreement, Acier has, at all times, conducted itself as a joint venture partner in the Jersey Walk Development.  Among other things, Acier has actively procured financing on behalf of the project (including sourcing opportunities and signing loan agreements), overseen and directed the construction of the project, and contributed its own capital to the project. In fact, to date, Acier has contributed over $8.8 million to the Jersey Walk Development, approximately two million more than Kramer has contributed.

61.     Consistent with the parties' agreement, as well as the parties' course of conduct, it is clear that Acier and Kramer are co-venturers with respect to the Jersey Walk Development.

62.     Despite these facts, however, Kramer has recently reneged on his arrangement with Acier and has represented to third-parties (including current and potential lenders), that Acier does

not have a stake in the Jersey Walk Development and that it is solely owned by Kramer through CMT. Kramer has also attempted to take unilateral control of the funds being disbursed to the Jersey Walk Development's construction.

63.     Kramer's actions have harmed the Jersey Walk Development by drawing lender attention (therefore negatively impacting future financing opportunities) and by delaying the prompt payment of construction costs.

64.     Despite Acier's repeated attempts to explain to Kramer (i) the harm posed by his actions, and (ii) how his actions are inconsistent with the parties' agreements and course of conduct, Kramer has refused to recognize Acier's equity share in the Jersey Walk Development.

65.     Clearly then, a justiciable controversy exists between Kramer (and CMT) and Acier, concerning whether Acier and Kramer are in fact co-venturers in the Jersey Walk Development.

66.     Accordingly, Acier requests a declaration from this Court that:

> (i)     Acier and Kramer are co-venturers with respect to the Jersey Walk Development pursuant to both the parties' agreement and course of conduct;
>
> (ii)    Acier therefore has an ownership interest in the Property/Jersey Walk Development; and
>
> (iii)   Acier and Kramer shall share in the profits and losses of the Property/Jersey Walk Development consistent with their January 11, 2018 agreement.

67.     Moreover, because Kramer has wrongfully attempted to deprive Acier of its joint venturer rights in the Jersey Walk Development by claiming to third parties (and this Court) that Acier has no interest in the Jersey Walk Development and the Property a constructive trust should be imposed upon the Property is warranted to preserve the status quo.

68.     A constructive trust is also warranted to remedy Kramer's maneuvers to unjustly enrich himself at Acier's expense by claiming the entire Jersey Walk Development as his own.

69.     Accordingly, in addition to making the declaration above, this Court should impose a constructive trust with respect to the Property and the Jersey Walk Development in its entirety.

## SECOND COUNT
### (Breach of Contract in the Alternative)

70.     Defendants repeat and reallege every paragraph set forth above as if fully set forth herein.

71.     In the event that this Court concludes that Acier is not entitled to any of the relief sought in its First Count, and/or that Acier and Kramer are not co-venturers, then it must be the case that Defendant Knight Construction, LLC, is serving as the Jersey Walk Development's third-party general contractor without any joint venturer interest from Knight's parent, Acier.

72.     If this is the case, then Knight is entitled to substantial compensation for its valuable services as general contractor at the Jersey Walk Development provided to Kramer.  As detailed above, Knight has, among other things, expended over $34 million in construction costs, has thus far foregone a general contractor fee for the Jersey Walk Development (which would be nearly $1 million), and has not submitted $9 million in change orders.  All of these actions have been taken by Knight believing there was a joint venture between Acier, Knight's parent, and Kramer.

73.     Nevertheless, Knight has a contract with CMT to serve as the general contractor for the Jersey Walk Development.

74.     Originally Knight entered into contracts to serve as the general contractor for the Project through general contractor agreements with Jersey Walk E Jersey Urban Renewal, LLC,

Jersey Walk Lafayette Urban Renewal, LLC, and Jersey Walk Garage Urban Renewal, LLC, all dated August 1, 2017.

75.     On January 9, 2020, however, Knight executed a contract with CMT assigning these prior contracts to CMT so that it was clear that Knight, the general contractor, was to serve as the general contractor for CMT.   This was needed so that Knight could receive loan disbursements directly from lenders in privity with CMT, the nominee entity which owned the Property.

76.     Accordingly, in the event that Acier and Kramer are not actually co-venturers, Knight must be compensated for its general contractor services pursuant to its contract with CMT.

77.     For example, though Knight has received approximately $30 million in draws from lenders to the Jersey Walk Project, but has financed over $34 million in construction costs.

78.     Therefore, in the event that Defendants do not prevail on the First Count of the Counterclaims, Knight is entitled to recover unpaid compensation from CMT pursuant to their contract, including, but not limited to, Kramer's non-payment of a development fee and change orders.

## THIRD COUNT
### (Quantum Meruit in the Alternative)

79.     Defendants repeat and reallege every paragraph set forth above as if fully set forth herein.

80.     As described above, Knight has provided many valuable general contracting services to CMT, including overseeing construction of the Jersey Walk Development.  This has included Knight financing construction at a loss of millions of dollars.

81.     In the event that Defendants do not prevail on the First Count of the Counterclaims, and any defect exists as to the contractual relationship between Knight and CMT so as to defeat

Knight's claim for breach of contract, then Knight should be allowed to recover from CMT quantum meruit for those general contractors services it has provided to CMT.

## FOURTH COUNT
### (Declaratory Judgment in the Alternative)

82.    Defendants repeat and reallege every paragraph set forth above as if fully set forth herein.

83.    In the event that this Court concludes that Acier is not entitled to any of the relief sought in its First Count, and/or that Acier and Kramer are not co-venturers, then Acier is also entitled to additional repayment from Kramer for money that Acier extended to Kramer that Acier believed was in the furtherance of the Jersey Walk Development.

84.    In particular, Acier has made the following loans to Kramer:

- Acier provided $5,595,061.79 to the Jersey Walk Development to finance the Project;

- Acier lent David Kramer $3,492,059.14 in connection with the Jersey Walk Development;

85.    Acier also helped Kramer secure $7,830,200.00 in financing, secured by Acier itself.

86.    All of these actions have been undertaken by Acier in furtherance of the joint venture that existed between Acier and Kramer.  However, if this Court concludes that Acier and Kramer are not co-venturers (and that these monies were not joint venturer property) then Acier should be entitled to recover against Kramer in connection with these loans to Kramer.

87.    Kramer has not undertaken to repay any of these loans and instead has thus far tried to have it both ways: to have Acier to contribute to the Jersey Walk Development as a co-venturer but to claim in this very litigation that the Jersey Walk Development is his alone.

88.     Clearly then, a justiciable controversy exists concerning the parties' rights and obligations in the event that this Court concludes that Kramer and Acier are not joint venturers.

89.     Therefore, in the event that Acier is unsuccessful on Count One, Acier and Knight alternatively request the following declaration:

> (i)     Knight Construction is the Jersey Walk Development's general contractor;
>
> (ii)    Acier is entitled to repayment of all funds (with interest) that it provided to Kramer and CMT in reliance on its understanding that Acier and Kramer were joint venturers with respect to the Jersey Walk Development.

**FIFTH COUNT**
**(Quantum Meruit in the Alternative)**

90.     Defendants repeat and reallege every paragraph set forth above as if fully set forth herein.

91.     In the event that this Court concludes that Acier is not entitled to any of the relief sought in its First Count, and/or that Acier and Kramer are not co-venturers, then Acier is also entitled to the reasonable value of its services that it provided to CMT as a co-developer of the Property.

92.     For example, as referenced above, Acier helped redesign the plans for the Jersey Walk Development, including redesigning the buildings so that they could yield the same amount of residential units in the same footprint of the old design, but with an additional savings of over $20 million in costs.

93.     If Acier is not a partner of Kramer in the Jersey Walk Development, then it is owed money for the reasonable value of its developer services provided to CMT.

94.     Therefore, in the event that Defendants do not prevail on the First Count of the Counterclaims, then Acier should be allowed to recover from CMT quantum meruit for those developer services it has provided to CMT.

**WHEREFORE**, Acier respectfully requests judgment as follows:

(a)     Judgment in favor of Acier on the First Count, a declaration that (i) Acier and Kramer are co-venturers with respect to the Jersey Walk Development pursuant to both the parties' agreement and course of conduct; (ii) Acier therefore has an ownership interest in the Jersey Walk Development; and (iii) Acier and Kramer shall share in the profits and losses of the Jersey Walk Development consistent with their January 11, 2018 agreement, as well as the imposition of a constructive trust with respect to the Property and the Jersey Walk Development; or

(b)     In the alternative (if the First Count is unsuccessful), judgment in favor of Knight on the Second or Third Counts, and an amount to be determined at trial representing either CMT's breach of its contract or quantum meruit for the general contractor services it provided by Knight to CMT and Kramer; and

(c)     In the alternative (if the First Count is unsuccessful), judgment in favor of Knight and Acier on the Fourth Count, and a declaration that (i) Knight is the Jersey Walk Development's general contractor, and (ii) Acier is entitled to the repayment of all funds that it extended to Kramer and CMT on reliance of its belief that Kramer and Acier were joint venturers with respect to the Jersey Walk Development; and

(d)     In the alternative (if the First Count is unsuccessful), judgment in favor of Acier on the Fifth Count, and an amount to be determined at trial representing the quantum meruit of the developer services provided by Acier to CMT and Kramer; and

(e)     Such other and further relief as the Court may deem just and equitable.

Dated: October 6, 2021
      New York, New York

                                     **MORRISON COHEN LLP**

                                     /s/ Y. David Scharf
                                     Y. David Scharf
                                     Christopher Milito (pro hac vice forthcoming)
                                     Collin A. Rose (pro hac vice forthcoming)
                                     909 Third Avenue
                                     New York, New York 10022
                                     212-735-8600