**MORRISON COHEN LLP**
Y. David Scharf
Christopher Milito (pro hac vice forthcoming)
Collin A. Rose (pro hac vice forthcoming)
909 Third Avenue
New York, New York 10022
212-735-8600

*Attorneys for Defendants Acier Holdings LLC,*
*Knight Construction, LLC, Dov Zabrowsky, Moshe*
*Glatzer and Jacob Glatzer*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CMT DEVELOPERS LLC, and DAVID KRAMER,

Plaintiffs,

-against-

ACIER HOLDINGS, LLC, KNIGHT CONSTRUCTION,
LLC, DOV ZABROWSKY, MOSHE GLATZER, and
JACOB GLATZER,

Defendants.

Case No.: 3:21-cv-12517

**DECLARATION OF**
**DOV ZABROWSKY IN**
**OPPOSITION TO**
**PLAINTIFFS' MOTION TO**
**DISCHARGE *LIS PENDENS***

DOV ZABROWSKY, hereby declares under penalty of perjury:

1.      I am an individual Defendant in this action, and I am also a principal of Defendants Acier Holdings, LLC ("Acier"), and Knight Construction, LLC ("Knight").  I am fully familiar with the facts and circumstances herein.

2.      I submit this declaration in opposition to the motion filed by Plaintiffs CMT Developers LLC ("CMT") and David Kramer ("Kramer") on February 10, 2022 (the "Motion"), to discharge the *lis pendens* filed by Defendants in connection with this litigation (the "*Lis Pendens*").

**Initial Relationship With the Property and Plaintiffs**

3.      My relationship with Plaintiff David Kramer dates back many years.  Prior to identifying the properties located at 907-931 East Jersey Street, Elizabeth, New Jersey (the "Property") as a potential business opportunity, I knew that Kramer was a real estate developer who had experience and a significant balance sheet.

4.      In or around 2015, my partner, Defendant Jacob Glatzer, identified first identified the Property as a commercial real estate development opportunity for our company, Defendant Acier.  We at Acier believed that the Property had significant potential to be developed into a mixed-use development with both residential and retail space.

5.      To take advantage of this identified opportunity, we determined that we would purchase the Property through our affiliate, Plaintiff CMT.  At the time, CMT was owned by Martin Zelcer, a partner and principal of Acier.

6.      Consistent with these plans, CMT purchased the Property on January 12, 2016, for $7,000,000.00 from H Elizabeth Realty, LLC.

7.      Following its purchase, however, we were concerned about our ability to obtain construction financing to develop the Property into the mixed-use space we ultimately envisioned.  As a result, we understood that it would benefit the Property and its future development to seek out a partner who would have a sufficiently large balance sheet to give comfort to lenders.  In this vein, we identified Plaintiff Kramer as a sensible partner.

8.      Following our discussions with Kramer about the Property and its future development, Acier agreed to enter into a joint venture with Kramer whereby Kramer would assist us in obtaining the necessary funds to construct our planned development.  The original terms of this joint venture agreement were that Kramer would receive 10% of any profits or losses of the

development at the Property in return for helping us obtain financing.  This agreement reflected that Kramer was to have a negligible role in managing the construction or development of the Property.

9.      To enable Kramer to assist us with financing from lenders, and to bring him into the joint venture officially, we agreed that Martin Zelcer would assign his interest in CMT to Kramer.  Despite the assignment having a price of $11 million, it ultimately was a paper transaction: Neither Acier, Zelcer nor Kramer exchanged any funds in carrying out this assignment.

10.      Eventually, Acier (not Kramer or any other party) determined the precise scope of the development to be constructed on the Property.  This development, known as the Jersey Walk Development, is to contain over four hundred apartment units, thirty thousand (30,000) square feet of retail space, and a parking garage.

11.      Years into the joint venture, in early January 2018, Kramer requested that we amend our joint venture agreement.  Though the original plan had been that Kramer would only assist in obtaining financing for the project, he had contributed funds towards the Property and Jersey Walk Development.  In good faith, my partners and I agreed to meet with Kramer and his religious and spiritual advisor's house in Monsey, New York on January 11, 2018.  There, in recognition of his contributions, we agreed that Kramer would have an interest in sixty percent (60%) of the Jersey Walk Development's profits and losses going forward, and a fifty percent (50%) interest in any future units at the Jersey Walk Development that would be necessary for the project to be approved and receive certain governmental subsidies.

**Acier Supports The Jersey Walk Development As A Joint Venturer**

12.     Even though this January 2018 amendment to our joint venture agreement altered the parties' economic relationship, my partners and I continued to take the lead on managing the Jersey Walk Development.   After all, Acier maintained (and still maintains) a significant ownership stake (40%) in the profits and losses of the Jersey Walk Development and the Property.

13.     Acier's involvement and contributions to the Jersey Walk Development have remained consistent since Acier first conceived of the project.   For example, Acier has greatly contributed to the Jersey Walk Development by managing the project's construction through its affiliate, Knight. Knight is responsible for the project's construction and has, at all times, been monitored and overseen by Acier.

14.     In addition, Acier has contributed to the Jersey Walk Development by (i) forming and managing several entities to enter construction agreements and procure tax-advantaged status for the Jersey Walk Development (i.e. Jersey Walk E. Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, and Jersey Walk Garage Urban Renewal LLC), (ii) seeking out and helping the project procure various forms financing, and (iii) redesigning the construction plans themselves so that the buildings could save millions in costs.

**Kramer Attempts To Unilaterally Claim Jersey Walk Development**

15.     In spite of Acier's sourcing of the project, our good faith in amending our joint venture agreement, and our vast contributions to the Jersey Walk Development, this litigation is the culmination of Kramer's attempts to divest Acier of any interest in the Jersey Walk Development and Property.

16.     In or around April 2021, Kramer began informing potential lenders and third-parties that he solely controlled the project and that Acier was merely the general contractor on the

project.  These representations harmed our ongoing efforts at the time to secure financing for the project.

17.     In or around June 2021, Kramer attempted to wrest unilateral control of the loan proceeds provided by Parkview Financial.  He specifically requested that the loan's proceeds no longer be distributed to Acier and Knight—where they were used to fund construction—and instead be diverted to an account only he controlled. This significantly alarmed Parkview Financial.

18.     Looking for another route to gain control of the project, Kramer then insisted that he would unilaterally the Jersey Walk Development Project.  My partners and I attempted to discuss this refinancing with Kramer at length, presenting him with financing offers we had sought out that had beneficial terms for the project, particularly compared to those financing offers he had sought out on his own accord.  For example, we proposed sourcing financing from Benefit Street Partners and Calmwater Capital, both of which offered in excess of $70 million and on good terms. We were concerned that Kramer was pursuing refinancing through Madison Realty Capital, a lender we knew to demand onerous terms and to make getting financing draws difficult.

19.     Despite our efforts, Kramer refused to substantively discuss financing and instead used information and documentation we had provided him in good faith to unilaterally obtain financing from Madison Realty Capital for $50 million on considerably worse terms than what we proposed.  Kramer used this financing to take Parkview Financial out of its loan, who had previously been alarmed at his behavior.

20.     It is my understanding that, as my partners and I predicted, Kramer has only gotten a minimal amount of funding from Madison Realty Capital for the Jersey Walk Development thus far.

**Evidence Demonstrates That Acier Is A Joint Venturer With Kramer**

21.     As Kramer took steps to divest Acier from its role as a joint venturer in the Jersey Walk Development and Property, Kramer filed this litigation in June 2021.  In his Complaint, Kramer identifies Acier as nothing more than an affiliate of Knight, which Kramer identifies as the Jersey Walk Development's general contractor.  Kramer also alleges that Acier has wrongfully claimed an interest in the Jersey Walk Development. A true and correct copy of Plaintiffs' Complaint (ECF Doc. No. 1) is annexed to this Declaration as **Exhibit 1**.  *See* Ex. 1 ¶¶ 11-12, 18, 23.

22.     I also understand that Kramer has filed a motion to dismiss Defendant Acier's first counterclaim, which seeks a declaratory judgment that "(i) Acier and Kramer are co-venturers with respect to the Jersey Walk Development pursuant to both the parties' agreement and course of conduct; (ii) Acier therefore has an ownership interest in the Jersey Walk Development; and (iii) Acier and Kramer shall share in the profits and losses of the Jersey Walk Development consistent with their January 11, 2018 agreement" and requests "the imposition of a constructive trust with respect to the Property and the Jersey Walk Development."  A copy of Defendants' Answer with Counterclaims (ECF Doc. No. 16) is annexed to this Declaration as **Exhibit 2**.  *See* Ex. 2 at 26.

23.     I understand that Kramer maintains in his motion to dismiss Acier's first counterclaim that documentary evidence confirms that he alone controls CMT and that therefore, Acier may not claim any interest in CMT.  As outlined above, however, Acier is not claiming an interest in CMT.  Our agreement with Kramer concerned the Jersey Walk Development in its entirety, not any interest in CMT specifically.

24.     Nevertheless, contrary to Kramer's suggestion in this Motion, there is substantial evidence that Acier served as a joint venturer with Kramer in connection with the Jersey Walk

Development.  In particular, substantial documentation shows that Acier and its members took on roles with respect to the Jersey Walk Development that were consistent with having an ownership and entirely inconsistent with the role that would be expected if Acier was only a general contractor, as alleged by Kramer in his Complaint.

25.     For example, in 2017, Kramer and Acier's principals at the time (myself, Martin Zelcer, Moshe Glatzer, and Yaakov Glatzer a/k/a Jacob Glatzer) formed several companies to effectuate the Jersey Walk Development.  These companies included Jersey Walk E. Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, and Jersey Walk Garage Urban Renewal LLC.  For all three limited liability companies, Kramer was to have a twenty-five percent (25%) stake in each company, while the principals of Acier were to collectively have a seventy-five (75%) stake in each company.  True and correct copies of the long-term tax exemption applications of Jersey Walk E. Jersey Urban Renewal LLC, Jersey Walk Lafayette Urban Renewal LLC, and Jersey Walk Garage Urban Renewal LLC, are annexed hereto as **Exhibit 3**, **Exhibit 4**, and **Exhibit 5**, respectively.  These applications describe the Jersey Walk Development, and identify the respective stakes that Kramer and the Acier principals had in the ownership of each entity.

26.     Acier's principals furthered the Jersey Walk Development by creating entities that could enter into construction agreements with Knight and pursue tax-advantaged status for the Jersey Walk Development.  Were Acier (or Knight) only the general contractor for the Jersey Walk Development (as alleged by Kramer), neither Acier nor Knight (nor any of its principals) would have helped create these entities.  Doing so, was only sensible *because* Acier had a clear and unambiguous ownership stake in the Jersey Walk Development.

27.     Similarly, on June 13, 2017, Acier sourced and closed upon a mezzanine loan for the project from Jersey Walk Mezzanine Lender LLC to Jersey Walk Mezz LLC, the mezzanine borrower for the project.  In support of this mezzanine loan, Kramer and Acier's principals (again, myself, Martin Zelcer, Moshe Glatzer and Yaakov Glatzer a/k/a Jacob Glatzer) signed a personal guaranty in the collective amount of the mezzanine loan.  A true and correct copy of this personal guaranty is annexed hereto as **Exhibit 6**.

28.     Again, Acier's principals never would have agreed to enter into these personal guaranties unless Acier, our shared company, had an ownership interest in the Jersey Walk Development.  Otherwise, we would have been potentially exposing ourselves to substantial personal liability for no upside (i.e. profits) in the project.  Moreover, contrary to Kramer's Complaint (*see* Ex. 1), we never would have entered into personal guaranties if we just were serving as a general contractor with respect to the Jersey Walk Development.  As a matter of industry custom and practice, general contractors do not act as guarantors for the financing of the project that has hired them.

29.     In March 2018, Acier sourced another loan for the Jersey Walk Development.  This time we sourced and closed a $15.5 million loan to CMT from TBG Funding LLC on March 28, 2018.  To assist in closing this loan, Kramer and Acier signed a personal guaranty for the benefit of TBG Funding LLC on March 28, 2018.  A true and correct copy of this personal guaranty is annexed hereto as **Exhibit 7**.

30.     This shared personal guaranty perfectly encapsulates the fact that Acier and Kramer were joint venturers with respect to the Jersey Walk Development.  Acier never would have personally guaranteed over $15 million of potential liability if it was not a joint venturer in the Jersey Walk Development.

31.     Eventually, in connection with this same loan, CMT, Kramer and Acier entered into a Settlement Agreement and Release with TBG Funding LLC in April 2020.  This agreement was signed by Kramer, Acier, and CMT separately, further demonstrating that there was a joint venture between the parties with respect to the Jersey Walk Development.  A true and correct copy of this Settlement Agreement and Release is annexed hereto as **Exhibit 8**.

32.     In addition to these various guaranties and agreements that Acier and its principals have entered into in reliance on Acier's ownership interest in the Jersey Walk Development, Acier's principals have also signed documents on behalf of CMT to assist it with procuring financing.  For example, in September 26, 2018, CMT took out a construction loan from Jersey Walk Phase 1, LLC in the amount of $74,496,002.00.  The promissory note and mortgage for this loan were signed by Kramer, myself, Martin Zelcer, Yaakov Glatzer (a/k/a Jacob Glatzer), and Moshe Glatzer.  On the promissory note, all of the Acier principals were listed as "partners" of CMT.  On the mortgage, all of the Acier Principals were listed as "members" of CMT.  True and correct copies of the promissory note and mortgage for this loan are annexed hereto as **Exhibit 9** and **Exhibit 10**.

33.     Similarly, I have signed documents on behalf of CMT with Kramer's explicit knowledge and assent.  For example, true and correct copies of an e-mail chain and its attachment from March 8, 2019 are annexed hereto as **Exhibit 11**.  This e-mail and attachment demonstrates that TBG Funding LLC requested a signature in connection with its loan to CMT (for use in the Jersey Walk Development), and that I returned the letter with my signature on behalf of CMT, copying Kramer on the e-mail exchange.

34.     In June 2019, following the March 2019 letter agreement, I signed a Note Amendment Agreement on behalf of CMT, which amended TBG Funding LLC's note with CMT.

Kramer was aware that I signed on behalf of CMT because he was copied on my e-mail and signed a related Reaffirmation of Guaranty.  True and correct copies of the e-mail chain and the signed Note Amendment Agreement and Reaffirmation of Guaranty are annexed hereto as **Exhibit 12**.

35.     Again, as with all of the personal guaranties and other financing activities Acier performed on behalf of the project, these loan documents and e-mail exchanges demonstrate that Acier was acting in reliance on its joint venture agreement with Kramer.  While we understood that CMT had been assigned to Kramer, Acier's principals, including myself, signed these documents because (1) these documents were meant to assist the Jersey Walk Development in procuring financing, and (2) Acier had an ownership interest in the Jersey Walk Development.  If Acier was only connected to the project as an affiliate of the project's general contractor (as Kramer alleges in his Complaint), none of Acier's principals, including myself, ever would have signed these documents.  *See* Ex. 1.

36.     Finally, in addition to all of the documented agreements including the parties above, Kramer also indicated his understanding that he had a joint venture with Acier when he e-mailed us for assistance in making certain payments to TBG Funding LLC, the aforementioned lender to the Jersey Walk Development.  For example, on August 14, 2019, Kramer e-mailed myself, Jacob Glatzer and Moshe Glatzer, asking if we could make a full or partial payment of $250,000 to TBG Funding LLC.  A true and correct copy of this e-mail exchange is annexed hereto as **Exhibit 13**.

37.     Kramer e-mailing us for this assistance only further supports the notion that we had an ownership interest in the Jersey Walk Development and that Kramer treated us as coventurers contributing to the project's progress.

**This Court Should Deny Plaintiffs' Motion**

38.    On the basis of the documentary evidence annexed to this declaration, it is clear that (i) Acier was a joint venturer in connection with the Jersey Walk Development at the Property, and (ii) Kramer's Complaint, which claims that Acier is merely an affiliate of the project's general contractor (Knight), is contradicted by substantial documentary evidence. Thus, this Court should deny Plaintiffs' motion to discharge the *Lis Pendens*.

39.    In addition, Plaintiffs' claim that the *Lis Pendens* should be discharged because it is only intended to cause significant hardship to Plaintiffs and/or cause the Plaintiffs to settle is untrue. Defendants only filed the *Lis Pendens* after careful consideration to ensure that the Property and Jersey Walk Development would be preserved during the pendency of this action. In particular, my partners and I had heard from third parties that Kramer was marketing the Property and was pursuing a sale. Fearing that he would deprive us of our interest and harm our rights in this litigation, we filed the *Lis Pendens* to protect and preserve the Property and Jersey Walk Development.

40.    Altogether, the *Lis Pendens* is necessary in this respect because Plaintiffs' actions leading up to this litigation demonstrate the lengths to which he will go to attempt to take unilateral control of the Jersey Walk Development. My partners and I fear that without the *Lis Pendens* in place, Kramer will sell the Property and Jersey Walk Development unilaterally (potentially at a loss) to moot our declaratory judgment action, alienate our ownership interest in the Jersey Walk Development and Property, and prevent us from ever fully receiving the benefit of our bargain in our joint venture agreement with Kramer. After all, it was Kramer, not us, who originally instituted this lawsuit in an attempt to divest Acier of its joint venture interest in the Jersey Walk Development.

41.     Plaintiffs' stated concerns about the impact of the *Lis Pendens* on the construction at the Jersey Walk Development and the financing CMT took out through Madison Realty Capital are also misplaced.

42.     First, with respect to the construction progress, it must be said that the Jersey Walk Development is almost entirely constructed, with one of the residential buildings only waiting on a final building inspection (after it recently passed a fire inspection).  The other residential building of the Jersey Walk Development is only a few months away from being completed.  Accordingly, the *Lis Pendens* is not meaningfully affecting the construction progress of the Jersey Walk Development.

43.     Moreover, the reason that there have been delays and rising expenses are unrelated to the *Lis Pendens*. Instead, the project has suffered delays and rising expenses only because Madison Realty Capital, the lender which we warned Kramer about, has only released a small fraction of the construction refinancing to the project thus far.  This has been true since Kramer refinanced the construction (a fact we warned him of) and it is not the result of the *Lis Pendens*.

44.     In turn, this shortfall of funds has made it harder for the Jersey Walk Development to pay its vendors on time.  This failure to timely pay vendors has caused the delays and rising costs, not the *Lis Pendens*.  Accordingly, Plaintiffs' raised concerns about construction delays and exorbitant expenses are meant to mislead this Court.  It is not the *Lis Pendens* that is not preventing the Jersey Walk Development from being fully completed (or causing rising costs), but rather Kramer's mismanagement of the construction's refinancing that has created those delays and rising costs.

45.     Plaintiffs' failure to receive construction draws from CMT's lender, Madison Realty Capital, is also unrelated to the *Lis Pendens*.  As discussed above, my partners and I were

12

concerned about the refinancing sought by Kramer and our concerns were shown to be valid. In the months after Kramer unilaterally refinanced the Jersey Walk Development's construction with Madison Realty Capital, the lender only agreed to fund a small portion of the overall draw of the loan (as we alleged in our Counterclaims). *See* Ex. 2 ¶ 49. Thus, again, Plaintiffs' complaints about the hardship of the *Lis Pendens* are ultimately unrelated to the *Lis Pendens* and represent longstanding difficulties plaguing the Jersey Walk Development as a result of Kramer's mismanagement and his attempt to take unilateral control of the Jersey Walk Development

46.     Finally, to the extent that Kramer complains that the *Lis Pendens* has harmed the relationship with Madison Realty Capital or caused a purported default, he conveniently overlooks that he instituted this litigation, not Acier. Instead, faced with a lawsuit that has harmed Acier's reputation, Acier's interests, and harmed the Jersey Walk Development, Acier has been left no choice but to defend itself against his baseless suit and protect its rights in the Property and Jersey Walk Development.

47.     In light of the foregoing, I respectfully request that this Court deny Plaintiffs' Motion to discharge the *Lis Pendens* in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   February 22, 2022
        Lakewood, New Jersey

DOV ZABROWSKY